Filed 7/30/14  P. v. Nunez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B246161 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA379962) |
| v. | |
| DANIEL ALEXANDER NUNEZ and VICTOR GUILLEN, | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Bob S. Bowers, Judge.  Reversed.

Eric R. Larsen, under appointment by the Court of Appeal, for Defendant and Appellant Nunez.

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant Guillen.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

_____

Daniel Nunez and Victor Guillen appeal from the judgments entered following a jury trial in which they were convicted of attempted murder and mayhem.

Guillen contends he was denied the assistance of counsel during several critical stages of the trial. We agree with respect to his attorney's absence during the prosecutor's rebuttal argument. The trial court attempted to obtain Guillen's waiver of counsel, but misadvised him that there was nothing left for his attorney to do. In actuality, the prosecutor's lengthy rebuttal included a number of objectionable arguments. Because counsel was completely absent during that stage and defendant's purported waiver of counsel was the result of the court's misadvisement, and thus not knowing and intelligent, we reverse Guillen's convictions.

Guillen and Nunez contend the trial court violated their federal constitutional right to present a defense by precluding them from referring to their first trial (which ended in a hung jury strongly favoring acquittal) as a "trial." Defendants sought to do so while cross-examining the prosecution's investigating officer about the timing of his discovery that a paid, in-custody informant claimed to be a percipient witness to both the attack upon which the charged offenses were based and several incriminating pre- and postoffense statements by defendants. In light of the particular circumstances in this case, we conclude the trial court erred by requiring defendants to refer to the prior trial as a prior "proceeding" because doing so precluded defendants from establishing support for their theory that the timing of the prosecution's procurement of the testimony of the paid informant suggested his testimony was fabricated and also diminished the investigating officer's credibility as a witness. We further conclude that the nature and gravity of the error amounted to a prejudicial denial of defendants' right to present a defense.

We also conclude the trial court erred by failing to instruct sua sponte regarding a statutorily mandated requirement of corroboration for the testimony of the same in-custody informant, but, given the necessity of reversal, we do not address whether this error was prejudicial.

2

# BACKGROUND

## 1. Original charges and first trial

Defendants initially were charged with attempted murder, with gang and great bodily injury allegations. Their second preliminary hearing was conducted on March 10, 2011. Testimony in defendants' first trial began July 15, 2011, and concluded on July 22, 2011. The jury could not reach a verdict as to either defendant and the trial court declared a mistrial. Jurors then revealed they were split 10 to 2 in favor of acquitting Guillen and 9 to 3 in favor of acquitting Nunez.

## 2. Addition of mayhem charge and retrial

On October 31, 2012, over defendants' objection, the trial court allowed the prosecutor to add a charge of mayhem (Pen. Code, § 203) with gang and great bodily injury enhancement allegations.

Jury selection in the retrial began on October 31, 2012. The court told prospective jurors the evidentiary portion of the trial was expected to last through November 9, 2012, the date the prosecutor had told the court she anticipated completing her case-in-chief. Presentation of evidence began November 6, 2012. Defendants began presenting their case on December 4, 2012. The jury returned guilty verdicts against both defendants and true findings on all enhancement allegations.

## 3. Evidence at retrial

### The attack on Felix Vega

On November 27, 2009, both defendants and Felix Vega were housed in dorm 826 at Los Angeles County's North County Correctional Facility (NCCF). Deputy Candice Sinohui was alone in a control area, supervising approximately 190 inmates in adjacent dorms 826, 827, and 828. Sinohui heard a commotion in dorm 826 and, from a distance of about five feet, saw inmates Nunez and Guillen attacking Vega's face and chest with their hands and feet. Sinohui called for backup and repeatedly ordered the inmates to stop fighting. The inmates complied only when other deputies arrived about 15 to 30 seconds after Sinohui's call. Nunez and Guillen quickly walked to a single-person

shower.  Although the dorms had surveillance cameras, the prosecution presented no such footage at trial.  Deputy Jason Kincaid, who responded to Sinohui's radio call, saw Guillen and Nunez standing together, clothed, in the shower, "furiously trying to wash off their bod[ies]."

Neither Guillen nor Nunez had any injuries.  Guillen's wristband appeared to have a drop of blood on it.  Nunez's face was flushed, his hands were red, and he was breathing hard.  He had a smear of blood on the back of his head and blood on his shoe and sock.  The investigating officer, Deputy Francis Hardiman, testified the shoe and sock had been destroyed sometime before trial.

Kincaid found Vega standing on the upper level of dorm 826.  Vega "looked dazed and confused and he was bleeding profusely."  He had lacerations on his head, ear, neck, and face.  A nurse washed the wounds and applied pressure dressing in an unsuccessful effort to stop the bleeding.  The nurse believed the bleeding could have been life-threatening and sent Vega to a local hospital.  Vega was discharged from the emergency room after less than three hours but he continued to receive medical treatment and had staples and stitches in his head three or four months after the assault.

Deputies did not question other inmates in the dorm about the assault.

**Defendants' street gang membership**

Pomona Police Department officers testified Guillen previously had admitted his membership in the Pomona 12th Street gang to them.  Guillen had tattoos common among 12th Street gang members, including "Pomona," and "SGV," but no tattoos specific to the gang.  Los Angeles Police Department officers testified Nunez had previously admitted his membership in the Barrio Van Nuys gang to several officers.

**The Southside gang and its internal struggle for control of NCCF**

Within the jail and prison system, all members of all Southern California Hispanic gangs, including members of the Pomona 12th Street gang and the Barrio Van Nuys gang, become members of "Southside," which prosecution witnesses classified as a gang itself.  The Mexican Mafia controls the Southside and collects money from its members

4

by taxing contraband and purchases from the jail canteen. Southside members and affiliates also must put their names, gang name, and other information on a "roll call" list used to coordinate assaults and transport contraband.

Deputy Christian Lopez testified jail inmate Lalo Martinez and state prison inmate Darryl Baca, acting through other inmates loyal to them, were engaged in a power struggle for control over the collection of "taxes" to be paid by Southsiders at NCCF to the Mexican Mafia from May or June of 2009 until early 2010. For a period of four or five months, Raymond Cuevas, a sheriff's department informant, took control on behalf of Baca. In August of 2009, Cuevas was assaulted and lost control to Vega, who was loyal to Martinez. When Vega was placed in disciplinary housing for a month, someone loyal to Baca seized control. After Vega was released from disciplinary housing, he was placed in dorm 826, which was mostly loyal to Baca. Cuevas told Deputy Lopez that Vega would be assaulted.

Although Hardiman did not know Nunez or Guillen, he opined both were members of the Southside gang. In response to a hypothetical question based upon a brief summary of the prosecution's evidence, Hardiman opined the assault on Vega was committed for the benefit of, at the direction of, and in association with the Southside gang.

### Testimony of informant Raymond Cuevas

Raymond Cuevas testified he began working as an informant before gaining control of NCCF on behalf of Baca in May of 2009. After Cuevas was attacked by two other inmates with razors in August of 2009, Vega took control of NCCF on behalf of Martinez.

When Cuevas got out of jail, he and his ex-wife traveled to Pelican Bay State Prison, where Cuevas's ex-wife visited Baca, who was her uncle. After the visit, Cuevas's ex-wife communicated to Cuevas an order from Baca to "hit" Vega. Cuevas phoned Deputy Lopez and said, "'[T]hey want [Vega] dead.'" Cuevas subsequently told his "crew" inside the jail that Vega "needs to get his medicine" and to "take his wind,"

5

meaning Vega was to be "killed, stabbed." Cuevas told them the order came "from the Bay." Cuevas testified that all Southsiders would be obligated to carry out such an order, and if an inmate disobeyed such an order, the disobedient inmate would himself be attacked. In contrast, carrying out such an order, even if the target did not die, would earn an inmate positive recognition from the Mexican Mafia and favored status among Southsiders.

Cuevas admitted he had received numerous benefits from cooperating with law enforcement as an informant, including money, a five- or six-year sentence in a third strike case in San Bernardino, and special privileges in the jail, such as a video game system and games, a DVD player, couch, television, private food cabinets, microwave, hotplate and refrigerator, laptop computer, exercise equipment, and coffee maker; telephone calling cards; access to a washer and dryer; face-to-face visits with his family; deliveries of groceries and hygiene products by his family; private dental care; and permission to cook his own meals. Cuevas also had not been prosecuted for ordering the hit on Vega.

### Testimony of informant Jose Paredes

Jose Paredes was also a Southside member and an associate of the Mexican Mafia. He admitted he had committed assaults and killed people for the Mexican Mafia. He had been in prison five times and was incarcerated at the time of his testimony.

In early November of 2009, before Paredes became a police informant, he was moved from the men's central jail downtown into dorm 826 at NCCF. He learned of the power struggle between Baca and Martinez and that dorm 826 was loyal to Martinez.

Nunez came to Paredes and said he had been asked to "whack[]" Vega. In Paredes's experience with Southside and the Mexican Mafia, "whack" meant kill. Paredes testified he advised Nunez not to get involved, but Nunez said that he was "going to do it anyways" and explained he had a tattoo he had not yet earned. Nunez later asked Paredes to pack up all of Nunez's belongings to give to deputies after the attack.

6

Immediately after Nunez talked to Paredes, Guillen told Paredes that he had also been asked to "whack" Vega. Paredes told Guillen it was dangerous and he should not do it. Paredes testified Guillen said he "was going to do it for the Surenos" and because he and the person who had ordered him to do it were both from Pomona and he had to "represent Pomona, put in work for the city." Guillen told Paredes the order came from Baca.

Paredes testified that on November 27, an inmate called Bird asked a deputy for permission to use the bathroom. Bird then returned to the bunk area and grabbed something from beneath his mattress. He gave something to Nunez and Guillen, and all three went downstairs. Bird approached Vega's bunk and punched Vega, knocking him to the floor.

Paredes testified he saw Nunez and Guillen strike Vega in the face and shoulders while Bird ran back upstairs. Nunez and Guillen also kicked Vega. Vega fought back and attempted to get away from them. Paredes testified the fight continued for four to five minutes before first Nunez, and then Guillen, ran to the shower and turned it on. He admitted he told Hardiman the fight lasted about eight minutes. After Nunez and Guillen broke off the attack, Vega walked slowly up the stairs, bleeding.

About a month after the attack, Nunez asked Paredes to send a message to let the shot-caller in his new dorm know that "what he had done was a righteous stabbing." On a later day, Nunez told Paredes he had tried his best in committing the assault. Thereafter, Nunez sent Paredes four or five "kites" (messages printed on a small piece of paper) asking him for assistance in explaining the stabbing to shot-callers.

Paredes also encountered Guillen sometime after the attack on Vega, and Guillen expressed worry because shot-callers loyal to Martinez were questioning the attack on Vega. Another time, Guillen approached Paredes and other inmates and bragged about his dominant role in the attack. Guillen said "he had done it for the Sur," and he had learned "in the streets" he had to participate when called upon to do work for the Southside. Guillen said he and Nunez had gotten in the shower after the attack to wash

the blood away.  Although Paredes "wore a wire" on many occasions to record conversations as an informant, he did not record the conversations he said he had with Guillen or Nunez.

Paredes began cooperating with Hardiman in July of 2010.  Hardiman was the detective assigned to a case pending at that time in which Paredes was charged with a conspiracy to commit murder and two counts of attempted murder, with a gang enhancement allegation, pertaining to an in-custody assault.  Paredes had prior "strikes" and faced a possible life sentence in his case, but he agreed to cooperate and testify in 12 specified cases pending against more than 20 defendants in exchange for a reduced sentence of eight years.  Paredes testified he had received other benefits, including about $20,000; meals from outside the jail; secure housing; special transportation; weekly face-to-face visits with his wife; private dental care; a couch; television; basic cable; microwave; hotplate; refrigerator; coffee maker; hand weights and other exercise equipment; laptop; computer monitor; DVD player and DVDs; PlayStation 3 and games; civilian clothing; radio; delivery of groceries, hygiene, and cleaning products; access to a washer and dryer; permission to cook in the jail's kitchen; and calling cards and free phone minutes.  In addition, Hardiman testified law enforcement spent money moving Paredes's family.

During one of his initial meetings with Hardiman in 2010, Paredes told Hardiman he had witnessed the assault on Vega.  Hardiman had a recorder on the table, as he did during other interviews, and Paredes believed the 2010 interview in which he told Hardiman in detail about the assault of Vega was recorded.  Paredes testified he gave multiple recorded statements regarding the assault.

**Testimony of Hardiman regarding Paredes as a percipient witness**

Hardiman, however, testified he did not learn Paredes had witnessed the assault on Vega until an interview in March or April of 2011.  Although Hardiman had been involved in the investigation of that assault since December of 2009, had been assigned as the lead investigator of that assault since early 2010, and had testified on March 10,

8

2011, in a preliminary hearing in the instant case, he did not make a report or take any notes regarding Paredes's revelation. Hardiman was taking notes during the interview in which Paredes disclosed this information, but he took notes only regarding matters other than the assault on Vega. Hardiman did not recall when he told the prosecutor in this case that Paredes was a percipient witness to the attack on Vega, but it might have been during the approximately two-week time period he spent in court and testified in a "proceeding" in this case[1] in July of 2011. He did not tell her for at least three or four months after Paredes told him. Hardiman further testified that because he was involved in a complicated operation with Paredes in which he was attempting to solve 21 murders, he did not interview Paredes in detail about the attack on Vega until September 6, 2011. Hardiman insisted that was the only recorded interview of Paredes pertaining to the attack on Vega.

Nonetheless, sometime between May and August of 2011, Hardiman moved Nunez and Guillen into the same jail housing module as Paredes so that Paredes could gather physical evidence against them. Paredes provided Hardiman with a roll call sheet listing Nunez and Guillen, along with their street gang affiliation, which was admitted as evidence in this case.

**Defense witnesses**

Emergency room physician and defense expert Dr. Paul Bronston testified that, based upon his review of the medical records and photographs pertaining to the injuries and medical treatment Vega received on November 27, 2009, Vega's injuries were neither serious nor life-threatening.

Felix Vega testified he was not attacked on November 27, 2009, but merely fell off his bunk and struck his head. Nunez tried to help him. Although Vega admitted he was a gang member and knew about Southside, he denied any knowledge of the Mexican

---

[1] The "proceeding" was the first trial in this case. At the retrial, the trial court precluded counsel from referring to the prior trial as a "trial," as further addressed in the Discussion section.

9

Mafia. He further denied he had been a shot-caller at NCCF and denied he had ordered a hit on Cuevas.

Nunez testified in his own defense. He admitted he was a proud member of the Barrio Van Nuys gang. He learned about the Southside gang and its rules when he went to jail in 2008. He complied with Southside's rules, including the rule requiring him to list himself on roll calls. At the time, he did not know Vega was a shot-caller.

Nunez denied attacking Vega, denied that anyone had told him to attack Vega, denied he had conspired with Guillen or anyone else to attack Vega, and denied he had made any of the statements Paredes attributed to him. Nunez testified he did not see the attack on Vega, but he noticed "a bunch of people running to the back" of the dorm. He went to see what was happening and saw Vega on the floor, covered in blood. Nunez helped Vega to his feet, then someone told Nunez to get away from Vega, so he began walking away. Sinohui ordered Nunez to go toward the bars, then other deputies handcuffed him. Nunez denied he had showered or gotten wet and that he had a weapon, handed anyone a weapon, or disposed of a weapon the day Vega was attacked. Nunez also denied he had ever sent Paredes a kite.

Edward Benevides was a gang member housed with Nunez in December of 2009. Their bunks were adjacent and they talked and played cards. Benevides testified no one threatened or pressured Nunez because of anything that had happened in the dorm, and Nunez never expressed fear of retribution. Benevides never saw him write a kite to Paredes. Sometime later, Benevides was housed with Paredes, who told him that after the attack on Vega, "they just came in and started picking people at random," and people were charged for something they did not do.

### 4. Verdicts and sentence

The jury convicted each defendant of attempted murder and mayhem. It found, with respect to each defendant, the attempted murder was willful, deliberate, and premeditated; each defendant personally inflicted great bodily injury in the commission of each offense; and the offenses were committed for the benefit of, at the direction of, or

10

in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members.

The trial court sentenced each defendant to 15 years to life in prison.

## DISCUSSION

**1.      Denial of counsel to Guillen**

**a.      Absence of Guillen's counsel during prosecution's rebuttal argument**

On November 15, 2012, nearly a week after the date the prosecutor had told the court she expected to conclude her case, counsel for Guillen informed the court he had a court appearance in Oakland scheduled for December 7, 2012.  The prosecutor responded, "I thought it would be done by the 9th but I honestly think if we are still in session by then, shoot me."  On December 5, 2012, Guillen's attorney reminded the court he had to be in Oakland "on Friday."

On December 6, 2012, the court instructed the jury, and the prosecutor and counsel for each defendant gave their closing arguments.  The trial court then asked the jury whether it preferred to hear the prosecutor's rebuttal argument that afternoon or to adjourn for the day.  The jury apparently indicated it preferred the latter option, and the court adjourned for the day.

When the trial resumed on December 7, 2012, counsel for Guillen was absent. The court stated, "Mr. Guillen, your attorney is not here.  And I don't—the question becomes—[¶]  Well, let me say this to you:  Both attorneys have made their—concluded their final arguments.  There is nothing for them formally to do in this case at this point. [¶]  So the question I am asking you:  Do you waive your right to have your attorney present for the remainder of these proceedings?"  Guillen replied, "Yes, sir."  The court stated its conclusion Guillen had "made a knowing and understanding waiver of his right to have his attorney present for the remainder of these proceedings."

The prosecutor then gave her rebuttal argument.  Although counsel for Nunez was present, he did not object at any point.  After the prosecutor concluded her argument, the

11

court read to the jury CALCRIM Nos. 3550 and 3557 regarding the duties of jurors and alternates during deliberations. The jury then began deliberating.

The next court day, the jury notified the court it had reached verdicts. Outside the presence of the jury, the court noted that counsel for Guillen was again absent and asked Guillen if counsel for Nunez could stand in for his attorney for the purpose of taking the verdicts. Guillen agreed, and the court took the verdicts and polled the jurors. All jurors affirmed the verdicts reflected their vote.

Guillen contends his convictions must be reversed because he was denied the assistance of counsel at three critical stages of the proceedings: during the prosecutor's rebuttal argument, when the two instructions were read at the conclusion of the prosecutor's rebuttal argument, and when the verdicts were taken. We agree with respect to counsel's absence during the prosecutor's rebuttal argument, and thus do not address his absence during the other two phases.

**b.      The constitutional right to counsel and requirements for waiving the right**

"The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process." (*Iowa v. Tovar* (2004) 541 U.S. 77, 87 [124 S.Ct. 1379] (*Tovar*).) A "critical stage" refers to "a step of a criminal proceeding, such as arraignment, that [holds] significant consequences for the accused." (*Bell v. Cone* (2002) 535 U.S. 685, 695–696 [122 S.Ct. 1843].)

"A person accused of crime, however, may choose to forgo representation. While the Constitution 'does not force a lawyer upon a defendant,' [citation], it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent [citation]." (*Tovar*, *supra*, 541 U.S. at pp. 87–88.) "The information a defendant must possess in order to make an intelligent election, our decisions indicate, will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." (*Id.* at p. 88.) The United States Supreme Court has prescribed a "'pragmatic approach to the waiver question,' one that asks 'what purposes a lawyer can serve at the particular stage of the

proceedings in question, and what assistance he could provide to an accused at that stage,' in order 'to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.'" (*Id*. at p. 90.)

c.      **The prosecutor's rebuttal argument was a critical stage of the trial.**

The prosecutor's rebuttal argument was lengthy, detailed, and included several arguments to which effective counsel should have objected, if present.  On several occasions she argued matters outside of the record to attempt to refute aspects of the defense.  For example, with respect to Paredes's credibility, she argued, "I would also submit to you there are 12 cases listed on there, 1 of which is this case.  He probably would have gotten that deal for the other 11, and not even have to testify in this case, because of the outstanding work that he has done."  To attempt to negate the defense theory about the deputies' failure to interview other witnesses to the attack on Vega, the prosecutor argued, "There were 64 people, 1 fell off the bunk, 2 are here as defendants, Jose Paredes is the 4th.  Where are those other 60 people?  They either wouldn't speak as good Southsiders, or they wouldn't have said anything different because they would have been here."  In each of these arguments, the prosecutor asserted factual matters unsupported by the evidence at trial in an attempt to diminish the strength of various defense theories and arguments.

In addition, the prosecutor made a misleading argument regarding proof of the gang enhancement allegation:  "Being an actual gang member:  Not an element.  But it sure is good proof that you committed the crime at the benefit of, at the direction of or in association with the gang."

Furthermore, the prosecutor arguably vouched for Hardiman's credibility by arguing, "It's insulting to both Deputy Hardiman and I to insinuate that I'm even a part of this conspiracy.  [¶]  He is a hard-working, dedicated detective, who takes a case and works it out."

13

Had Guillen's attorney been present and performing effectively, he likely would have objected to these improper arguments. It is impossible for this court to determine what effect such objections might have had, either being sustained, provoking an admonishment to the prosecutor or jury, simply causing the prosecutor to choose her words and arguments more cautiously, or even a subtle, unquantifiable effect on the jury, such as preventing one or more jurors from accepting the prosecutor's argument without question as necessarily true.[2] We need not attempt to make such a determination, however, to conclude that the prosecutor's rebuttal argument held significant consequences for defendant Guillen, and thus was a critical stage of the proceeding. The failure of codefendant's counsel to object to the prosecutor's arguments is of no consequence. He did not represent Guillen, and his failure to object does not demonstrate that the prosecutor's arguments were unobjectionable.

Accordingly, we conclude Guillen was deprived of the assistance of counsel at a critical stage of the proceedings.

**d.      Defendant's waiver of counsel on December 7, 2012, was invalid.**

When the trial court advised Guillen before asking if he waived the presence of his counsel on the morning of December 7, 2012, it told him there was nothing for his attorney "formally to do in this case at this point." This was erroneous. As noted, had Guillen's attorney been present, he could, for example, have objected to the prosecutor's improper arguments set forth above. Thus, Guillen's waiver of counsel cannot be deemed knowing and intelligent, and cannot be given effect.

**e.      The error requires reversal without a showing of prejudice.**

Prejudice is presumed where a defendant had been denied the assistance of counsel during a critical stage of the proceedings. (*United States v. Cronic* (1984) 466 U.S. 648, 658–659 [104 S.Ct. 2039] (*Cronic*).) "'When that has occurred, the likelihood

---

[2] In addition, such objections would have preserved the issue of prosecutorial misconduct for appellate review.

14

that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary.'" (*People v. Lightsey* (2012) 54 Cal.4th 668, 700.)

In *Cronic*, the Supreme Court explained, "[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.' [Citation.] The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." (466 U.S. at pp. 656–657, fns. omitted.)

Undoubtedly, counsel's departure for Oakland placed the trial court in a difficult position. However, the trial court knew counsel planned to be in Oakland on December 7, 2012, and could have required the prosecutor to complete her rebuttal argument on the afternoon of December 6, 2012, instead of allowing the jury to determine when the prosecutor would argue. Moreover, the record does not indicate the trial court made any effort to prevent Guillen's attorney from being absent during proceedings by, for example, asking him to attempt to reschedule his appearance in Oakland or to have another attorney appear in Oakland for him, contacting the court in Oakland to assist Guillen's attorney in rescheduling his appearance, or adjourning during the time Guillen's attorney had to be in Oakland. Indeed, the court does not appear to have even asked Guillen's attorney the nature of the proceeding he was supposed to attend in Oakland. If counsel's absence could not have been prevented, the court could at least have discussed Guillen's waiver of counsel on December 5, 2012, while counsel was present. In any event, the court was not at liberty to solve the problem by obtaining an invalid waiver of counsel in order to proceed with Guillen's trial. By doing so the trial process with respect to Guillen lost its character as a confrontation between adversaries and thus violated Guillen's constitutional right to the assistance of counsel. Because

15

Guillen was denied the assistance of counsel during a critical stage of the proceedings, prejudice is presumed and we must reverse his conviction.

**2.     Violation of Nunez's and Guillen's right to present defense by prohibiting reference to prior trial**

Guillen contends the trial court erred and violated his federal constitutional right to present a defense by precluding him from calling the first trial a "trial." He argues it was important for him to be able to use the word "trial" so the jury would understand the gravity of discrepancies in the testimony of Hardiman and Paredes as to when Hardiman and the prosecutor learned Paredes was an eyewitness to the attack by Guillen and Nunez on Vega. Guillen asserts that the credibility of Paredes and Hardiman was dubious because it appeared Hardiman and Paredes may have fabricated Paredes's testimony after the first trial ended without a conviction. Nunez joins in the argument, which is equally applicable to him.

**a.     Proceedings in the trial court**

A principal defense theory was that Paredes, in order to obtain additional benefits as an informant, fabricated his statements and testimony about witnessing the attack and about defendants' statements to him before the attack. Defendants expanded their theory to encompass Hardiman's credibility when Paredes testified at trial that Hardiman knew in 2010 that Paredes was a percipient witness to the assault, contradicting Hardiman's testimony that he did not know that until March or April of 2011.

Counsel for Nunez explained to the court the original preliminary hearing in this case had been conducted in "June of 2010. It was dismissed and refiled, so this was a second preliminary hearing in March of 2011," at which Hardiman "was asked specifically did he know whether or not Mr. Nunez had talked to any other Southsider about directed [*sic*] hit on Felix Vega and his answer was no. . . . [¶] Which arguably if he was, if Paredes had told him before then in March, then he would have been lying under oath. If Paredes told him after that in March or April, then he had a duty to turn over that, the name of that percipient witness, at least we can assume that he inform [*sic*]

16

the district attorney, who had a duty to turn it over to defense which did not occur. [¶] And there was a trial where Mr. Paredes still is nowhere in the picture. They get a hung jury and then he surfaces as a percipient witness. All of this, it smelled, it doesn't pass the smell test whatsoever. [¶] I believe it's a gross violation of Mr. Nunez' right to cross and confront witnesses against him, and it calls for sanctions on some level. But at least, at least a minimum we need to get to the bottom of it, and I would ask the court a wide latitude in cross-examining this officer, who we know, we sit here watching, he is detailed [*sic*] oriented. [¶] . . . [¶] I need to be able to ask him about that report that he handed over. When did he first tell the district attorney's office that he had a percipient witness since he already knew in March or April. These things have to be explored, your honor."

Counsel for Guillen added, "I think the court needs to know about the backdrop to the case because there is a pattern here that every time there is a weakness in the case, Ms. Brako and Mr. Hardiman or officer whatever, Deputy Hardiman goes and gets a paid informant to come and shore up the case. [¶] The reason why the case was dismissed and we had a second preliminary hearing is because Judge Marcus refused to even allow Ms. Brako to put on this convoluted Mexican Mafia theory. She dismissed, came back with Cuevas. We never heard of Cuevas before. [¶] We go to trial. We get 10 to 2 for not guilty, hung jury. She comes back with another paid informant who we never heard of. [¶] So [] there is a lot of stuff going on here that needs to be explored. I think we need to know from Ms. Brako when she found out there was a percipient witness. It is not just [] Deputy Hardiman, but it's also the District Attorney's office." The trial court asked how this affected the trial. Counsel for Nunez explained it reflected upon the credibility of both Paredes and Hardiman.

On examination by the court outside the presence of the jury, Hardiman testified he had learned Paredes was a percipient witness to the attack "like the early to middle of March," possibly before March 10, 2011, when Hardiman testified at the second preliminary hearing in this case. He testified he had not told the district attorney until

17

"probably in late June or July" of 2011. Hardiman did not know if he reported the information to the district attorney before or after he testified at the first trial in this case, but he knew he told her "sometime between June and July."

The court then examined the prosecutor under oath, also outside the presence of the jury. She testified this case had been her responsibility since it was originally filed. She was aware that Paredes was a percipient witness at the time of the first trial, which commenced on July 15, 2011, but not the March 10, 2011 preliminary hearing. She could not recall when she learned this, but said, "I almost want to say that it was during the trial." She was unable to be more specific. She did not inform the defense about Paredes until "[a]fter [he] was completely interviewed in September of 2011."

Counsel for Nunez then told the court, "I would like to be able to cross-examine the detective in the manner the court has. [¶] I know every time we talk about was this a trial, we are not supposed to use that word, but I think it's relevant when he got to know, relative to the times that he testified. [¶] He is claiming that he is not, you know, this is not on his radar, but he is in the middle of a trial, and he is communicating this to the district attorney. I don't need to use the word 'trial,' but I don't want—I want to have the ability to test this officer's credibility."

After the court pondered whether it was necessary to use the word "trial," for "clarity" regarding "this time frame issue," counsel for Nunez reversed his position on the necessity of using the word "trial": "We are talking about a trial. We are talking about a trial. In my—it becomes relevant that it is a trial because he sat there in this trial like he is sitting here in this one. And he is trying to say he is working on 50 million other things that are far more important, but yet he spends two weeks or more sitting down on this case, and he knows there is a percipient witness who told him months earlier that they saw the event. So it's highly important—"

The prosecutor argued, "Paredes was operating in an undercover capacity" until August of 2011, and disclosing information about him during the first trial in this case would have hampered "an ongoing investigation" and created issues under "both 1054.7

18

of the Penal Code as well as 1040 to 1043 of the Evidence Code." She further argued she could not have called him at that trial because she had not disclosed him to the defense prior to trial, and she did not deem the information he provided to be exculpatory.

The court stated it disagreed with the prosecutor's analysis and said it would allow defense counsel to cross-examine Hardiman as he had requested and to refer to the prior trial as a "trial."

Counsel for Guillen raised the possibility he would call the prosecutor as a witness regarding Hardiman's credibility, and the court agreed the prosecutor was "very much a witness in this case as to the credibility of Hardiman, very much." The court decided to adjourn for the day to allow the prosecutor to discuss with her office "how this is going to be handled because I do believe, as a result [of] what has been said in court, that the defense is going to call you in connection with Hardiman."

When the trial resumed the next morning, the court announced it had reconsidered its decision, stating there was no violation of *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194] (*Brady*), the prosecutor was not obliged to call Paredes at the preliminary hearing or first trial, the defense had had an opportunity to interview Paredes after the prosecutor disclosed him, the court did not know if Hardiman was asked at the preliminary hearing if he was aware of any other percipient witnesses, and the defense had "not been compromised" in either trial because the matters to which Paredes testified were not exculpatory. The court therefore ordered, "[T]he term 'trial,' 'prior trial' will not be used. And literally based on the court's ruling, I will allow, as I said yesterday, [defense counsel] to inquire when certain information was given but it's not determinative of what the court's ruling is in this matter."

After counsel for Nunez attempted to clarify what the defense could and could not ask Hardiman, he argued, "I feel that there is much that we should be able to ask. I think the court was on the right track yesterday with our being able to use the word 'trial.' He was in a trial. It's very relevant to me or I believe it would be relevant to the truth because that is what we are searching for, we are searching for the truth. And this man

19

was in a trial on this case some two and a half weeks." The trial court replied, "Everything you argue would make sense if it was exculpatory," and refused to modify its ruling. Counsel for Nunez argued, "Credibility is always an issue. The credibility of the officer is at issue."

Counsel for Guillen added, "Credibility is this whole case. There is nothing else. That goes for everybody involved, including Ms. Brako. . . . They are saying believe everything that Mr. Paredes says except for the stuff that hurts us. You can't believe it although he said it four times and in some detail, Deputy Hardiman broke out a tape recorder and recorded this statement in August of 2010. [¶] The jury needs to know to get to the bottom of that . . . . In this case, there is no physical evidence because it wasn't preserved. That is fishy. There is no wire used despite a history by Paredes of working for Deputy Hardiman and the sheriff's department where he wears a wire. When did this wire wearing begin? [¶] This case has an history where every time the district attorney is at a great disadvantage [s]he goes out, her and Deputy Hardiman go out and gets a snitch, pays them a whole bunch of money, gives them a whole bunch of gifts, gives them love on their cases where they get this [*sic*] greatly reduced sentences and they come out here and testify, no corroboration whatsoever. [¶] They can completely make this stuff up. There is no recording, there are no wires, there is nothing. They can just come in here and say whatever they want to say. And I believe that it's not just that the evidence has to be exculpatory. She has a duty to disclose a percipient witness to the defense. At that last trial she didn't do that."

Counsel for Guillen argued it was also "a *Brady* issue" (373 U.S. 83) and an ongoing violation of the defendants' due process rights.

The trial court refused to modify its ruling or allow counsel to refer to the prior trial as a "trial." Counsel for Nunez thereafter asked Hardiman, in the presence of the jury, about his testimony at "a preliminary hearing held on Thursday, March 10, 2011," and his testimony at "a proceeding" in July of 2011. Guillen's attorney similarly

20

questioned Hardiman about his participation in "the two-week proceeding last year and both of the preliminary hearings" and "the proceeding last summer."

**b.      The issue was adequately preserved for appeal.**

The Attorney General characterizes the issue as the exclusion of "evidence that the first trial ended in a hung jury" and contends defendants forfeited the claim by failing to raise it during trial.  However, at trial defendants did not seek to introduce the *result* of the first trial.  We read Guillen's opening brief as challenging only the trial court's ruling requiring counsel to refer to the prior trial as a "proceeding," not a "trial."[3]

Failure to raise a particular theory of admissibility precludes a defendant from relying upon that theory on appeal.  (*People v. Fauber* (1992) 2 Cal.4th 792, 854.)

The Attorney General argues defendants argued the issue "in terms of . . . discovery and credibility issues, and in the context of asking for latitude in cross-examining Deputy Hardiman," and failed to argue "that such evidence was relevant to prove a defense theory that the prosecutor produced Paredes as a false witness during the second trial in response to the fact that the prior trial resulted in a hung jury."  Alternatively, the Attorney General argues defendants "failed to press for a ruling on this specific theory of admissibility."  Neither argument has merit.

Throughout the discussion of the issue over the course of two days, defendants argued *both* that the prosecution had violated its disclosure duties *and* that the timing of the development of Paredes as a percipient witness in relation to the proceedings— including the first trial—in this case supported an inference that Paredes's statement and testimony had been fabricated to bolster the prosecution's case after the jury in the first trial hung, favoring acquittal.  Indeed, counsel repeatedly informed the trial court of this theory and argued it vigorously until the court refused to hear any further argument or alter its ruling on the second day it considered the issue.  The Attorney General's reference to "credibility issues" and "latitude in cross-examining Deputy Hardiman" is, at

21

best, a distinction without a difference.  We conclude the basis of admissibility raised on appeal was presented to the trial court.

Nor is this a case where the court failed to rule upon an objection or request to admit or exclude evidence and the aggrieved party did not ask the court for a ruling (cf. *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [defendant failed to obtain express ruling on motion in limine to exclude rifle], and cases cited therein).  Indeed, the trial court ruled twice on the issue:  First it allowed defense counsel to refer to the prior trial as a "trial," then it reversed itself the next day.  Moreover, as set forth above, when the trial court on the second day expressed its view of the issue in terms of the prosecutor's disclosure duties, defense counsel reasserted the necessity of referring to the prior trial as a "trial" to establish that Paredes and Hardiman fabricated Paredes's statement and testimony as a percipient witness.  The Attorney General's contention defendants failed to press for a ruling simply is incorrect.

**c.**     **Admissibility of evidence and effect of exclusion of evidence on constitutional right to present a defense**

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of an action." (Evid. Code, § 210.)  We review any ruling on the admissibility of evidence for abuse of discretion.  (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

Absent a valid state justification, the exclusion of competent, reliable evidence that is central to the defendant's claim of innocence deprives a defendant of his federal constitutional right to present a defense.  (*Crane v. Kentucky* (1986) 476 U.S. 683, 690 [106 S.Ct. 2142].)  We review such an error pursuant to the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824]:  the Attorney General must prove beyond a reasonable doubt the error did not contribute to the verdict.

---

**3** If defendants actually intended to challenge exclusion of the result of the first

22

**d.**     **The trial court erred by preventing defendants from referring to the prior trial and its timing, in violation of their constitutional right to present a defense.**

Paredes testified he had informed Hardiman in 2010 that he had witnessed the assault on Vega. Hardiman testified Paredes did not reveal this until March or April of 2011. Under either scenario, Hardiman, the prosecution's investigating officer in this case, knew several months before the first trial in this case in July of 2011 that Paredes claimed to be a percipient witness. The prosecution had no other non-law enforcement percipient witness willing to testify and no witness at all who could testify to matters reflecting upon the subjective intent of Nunez and Guillen, yet Paredes was not used as a witness at the first trial. Indeed, Hardiman may not have informed the prosecutor that Paredes said he saw the attack on Vega until sometime near or during the first trial. It was only when the prosecution was faced with a retrial that Paredes was developed as an extremely helpful prosecution witness.

Under the unique circumstances of this case, use of the word "trial," together with evidence of the timing of the first trial, was highly relevant to the defense and should have been permitted. Defendants possessed a potentially persuasive argument that the timing of the prosecution's development of Paredes as a percipient witness in this case was highly suspicious. Taken in conjunction with the undisputed fact that Paredes was compensated in many ways for his testimony in this case, as well as other cases, defendants' argument could have supported an inference Paredes's testimony was fabricated. It also could have reflected upon Hardiman's credibility.[4]

---

trial, they forfeited that limited aspect of their issue by failing to raise it in the trial court.

[4] In this regard, it is worth noting Hardiman admitted at the second trial that sometime between May and August of 2011—before the September 6, 2011 interview with Paredes—he housed Paredes with defendants for the express purpose of having Paredes gather physical evidence against defendants for use in this case. Defendants did not argue this matter to the trial court in regard to the ruling under review because Hardiman had not yet so testified.

23

Allowing defendants to introduce the timing evidence by referring to a preliminary hearing and a prior "proceeding" did not reflect upon the credibility of Paredes and Hardiman to the same extent as it might have if defendants had been permitted to call the trial a "trial." Throughout the trial, the jury heard a multitude of references to prior proceedings and hearings that had occurred in the case, including references to testimony given at a "prior" or "previous" "hearing" or "hearings," at "a hearing," or "another hearing," at "the hearing last year," on "prior occasions" at a "preliminary hearing," and at a "preliminary hearing" "and at a hearing after that." The jury also learned there had been more than one "preliminary hearing" in the case.

Hardiman expanded the category of events called "proceedings" by telling the jury about arraignment: "When a person is charged with a crime, once they are arraigned, meaning there is *a formal proceeding* with the judge and defense attorneys and they are told what the charges are against them, their sixth amendment right attach [*sic*] and those sixth amendment rights are essentially as a defendant in a criminal matter you have a right to have a lawyer present with you at *any proceeding* with the government." (Italics added.) Hardiman also added the two preliminary hearings to the category of "proceedings." Defense counsel asked, "You have been actively involved in the two-week proceeding last year and both of the preliminary hearings and in this trial; is that fair to say?" Hardiman replied, "I have been present for all of those proceedings, correct."

Thus, the jury heard that many "proceedings" and "hearings" had been held in the case, and some trial witnesses had testified at some of those proceedings. Some of these had been called "preliminary," and all had preceded the trial the jurors were hearing. Absent knowledge that one of those prior "proceedings" or "hearings" was itself a trial, rather than a preliminary determination of less gravity, the jury could not possibly have understood either the significance of the timing issues or their relevance to the credibility of Hardiman and Paredes. Indeed, because Hardiman testified he had been actively involved in the "two-week proceeding last year" and this "*trial*," the jury might well have

concluded that the "two-week proceeding" was something other than a trial. Otherwise it would have been called a "trial" as the current trial was.

"Proceeding" was thus completely inadequate to convey to jurors the suspicious nature of the timing of the development of Paredes's testimony because it did not convey the *significance* of the lack of testimony by Paredes at a prior trial. In addition, without use of the word "trial" the jury might not have understood any *incentive* the prosecution might have had to use Paredes's testimony at the first trial if it was legitimate or, alternatively, to obtain potentially falsified evidence in light of its loss at the first trial.

We can best explain the importance of the word "trial" by analogy to D-Day. The first trial in July 2011 was D-Day. If Eisenhower's intelligence chief testified that he had key information about the defenses on Omaha Beach three to four months before D-Day, but did not bother to tell Eisenhower until the first landing craft were launched, a reasonable person would have found the testimony incredible. Moreover, if the intelligence chief testified that he waited to ask his source about details, such as what weapons were deployed on the beach, until two months *after* D-Day, the average person would be dumbfounded.

On the other hand, if the intelligence chief testified he had key information about the defenses on Omaha Beach three to four months before some "proceeding" (which could be understood as merely a staff meeting, war game, or drill), or failed to follow up on it until two months after some "proceeding," a reasonable person might well fail to understand why the testimony was not credible.

Jurors probably wondered why defense counsel were so obsessed with the date Paredes told Hardiman he was a percipient witness to the attack on Vega and the date Hardiman informed the prosecutor of this, given that Hardiman and the prosecutor both clearly knew about Paredes long before the trial the jurors were sitting through. Indeed, because the timing issue arose December 3, 2012, more than three weeks after the date the trial court had told jurors the evidentiary portion of the trial should conclude, jurors

25

may well have been angered by defense counsels' trial-prolonging obsession with the seemingly irrelevant or, at best, trivial timing matter.

The Attorney General argues defendants' theory was "factually incorrect" because Hardiman knew Paredes was a percipient witness before the first trial and the prosecutor learned this during the first trial, and this "uncontroverted testimony shows that the prosecutor and Deputy Hardiman did not, in response to the first trial resulting in a hung jury, then seek and obtain false testimony from Paredes." This argument is nothing more than a competing inference the prosecution could have argued to the jury had defendants been allowed to develop their defense theory through reference to the prior "trial." The testimony of Hardiman and the prosecutor outside the presence of the jury did not establish the factual invalidity of the defense theory and neither justified, nor was the basis of, the trial court's ruling.

The Attorney General further argues the trial court properly excluded reference to the first trial as a "trial" pursuant to Evidence Code section 352 because the evidence would have confused the jury, resulted in undue consumption of time, and created a danger of undue prejudice through jurors speculating "about the reasons the prior trial resulted in a hung jury." The trial court did not exclude the evidence for any of these reasons, but because it felt there was no discovery violation. Moreover, the timing evidence was introduced, but phrased in terms of a prior "proceeding," not a prior trial. Allowing counsel to refer to a prior "trial" would have consumed no more time and would likely have been less confusing to the jurors because the significance of the timing with respect to a prior "trial" would have been more apparent than the significance with respect to a prior "proceeding." Nor would reference to a "trial" have created a substantial danger of undue prejudice that substantially outweighed the extremely strong probative value of the evidence that the proceeding was, in fact, a trial. As previously noted, defendants did not seek to introduce the result of the prior trial. The trial court could have instructed the jury not to speculate on the result of the prior trial or why a second trial was being conducted.

26

The trial court's error precluding defendants from referring to the prior "trial" diminished the support for their theory that Paredes's testimony was fabricated and completely deprived defendants of support for their theory that Hardiman intentionally procured Paredes's false testimony when the prosecution was faced with retrying the case. The trial court's justification for exclusion, that the prosecutor did not violate any duty of disclosure, was based upon an entirely different issue and cannot be deemed a valid state justification for exclusion with respect to the defense theory in issue herein. The evidence that the prior "proceeding" was a trial, together with inferences defendants sought to establish therefrom, were competent, admissible, and crucial to the defense. Accordingly, we conclude the trial court's ruling deprived defendants of their federal constitutional right to present this defense.

**e.      The error was not harmless beyond a reasonable doubt.**

Because the court's ruling violated defendant's federal constitutional right to present a defense, the Attorney General has the burden of proving beyond a reasonable doubt the error did not contribute to the verdict. The Attorney General argues the error was harmless because evidence of defendants' guilt was strong, and defendants presented extensive evidence and argument regarding Paredes's credibility and when Hardiman discovered and informed the prosecutor Paredes was a percipient witness.

Although the testimony of Sinohui supported a finding defendants attacked Vega and her testimony was corroborated to some extent by Kincaid and the nurses who examined defendants after the attack, this testimony did not address defendants' subjective intent (that is, to kill Vega, as opposed to assaulting him) and was by no means a guarantee of conviction on any charge, as illustrated by the result of the first trial. Sinohui and both nurses testified in the first trial, yet the jury strongly favored acquittal for both defendants. Kincaid saw defendants in the shower, acting suspiciously, but he did not see the attack on Vega. Paredes's testimony not only added another voice identifying defendants as the perpetrators of the attack, but, crucially, provided the only direct evidence defendants intended to kill Vega and had individual motives for doing so,

27

beyond merely following a Southside order. In addition, Paredes's testimony was the sole source for post-attack statements by defendants acknowledging and even boasting about their participation in the attack. Paredes's testimony was central to the prosecution's case in the retrial. Under the circumstances, we cannot conclude the remaining evidence of defendants' guilt was so strong that denying defendants an additional avenue for discrediting Paredes's testimony was harmless beyond a reasonable doubt.

The court's ruling precluding defendants from referring to the prior "trial" completely deprived defendants of support for their theory that Hardiman intentionally procured Paredes's false testimony when the prosecution was faced with retrying the case. Although the jury learned of Paredes's prior convictions and his status as a paid informant, the elimination of the timing theory linking the procurement of Paredes's testimony to the necessity for retrial significantly diminished the defense effort to establish Paredes's testimony was fabricated. In addition, the evidence showing Paredes had prior felony convictions and received material benefits for providing testimony reflected only upon Paredes's credibility, not Hardiman's. The defense theory of relevance in the trial court expressly included Hardiman's credibility.

Accordingly, we cannot conclude the trial court's ruling precluding defendants from referring to the prior "trial" was harmless beyond a reasonable doubt. Their convictions must be reversed, but we briefly address one other issue to attempt to prevent its repetition in a retrial.

**3.      Failure to instruct sua sponte as required by Penal Code section 1111.5.**

Penal Code section 1111.5, which became effective on January 1, 2012, requires corroboration of the testimony of an in-custody informant.

All parties agree the trial court erred by failing to instruct sua sponte on this requirement of corroboration, but they dispute whether the error was prejudicial. Given our disposition, we need not determine whether the error was prejudicial. If Paredes or any other "in-custody informant" testifies in a retrial of this case, the trial court must

28

instruct the jury on the requirement of corroboration set forth in Penal Code section 1111.5.  (*People v. Davis* (2013) 217 Cal.App.4th 1484, 1489.)

**4.     Remaining issues**

Given our disposition, we need not address the remaining issues.  In particular, we note defendants can challenge the addition of the mayhem charge as vindictive and request instruction on coconspirators' statements in the trial court.

**DISPOSITION**

The judgments are reversed.

NOT TO BE PUBLISHED.

MILLER, J.*

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.